Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable United States Court of Appeals of the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, everybody. Please be seated. Welcome to the Fourth Circuit. We have three cases on for argument this morning. First case is 23-1400, Anderson v. Diamondback Investment Group, LLC. Mr. Fong. Mr. Fong. Whenever I'm ready. Your Honor, may it please the Court, my name is Wilson Fong. I represent Tanya Anderson, the appellant. This case is about limiting employers' power over their employees' personal health care decisions. My client, Tanya Anderson, has anxiety and muscle spasms. To treat these, instead of using prescription medications, she uses hemp products, legal hemp products. They work for her. She worked for Diamondback for three months in 2020 before she was fired for testing positive for marijuana, more specifically THC, the active ingredient of marijuana, as well as hemp products. During these three months, she performed her job extremely well. There's no evidence that Anderson's use of hemp products affected her performance or presentation at work in any way. There is no evidence that she used any illegal drugs. She denies getting high, and there's no evidence that she ever was. She told her supervisor, Brad Yoder, that she used hemp products and what she used them for. She also told him that the hemp products could result in a positive drug test and provided a note to that effect from a provider. Yoder told the defendants all of this, but the defendants still fired her for testing positive for THC, knowing that her positive was likely a result of her disabilities and her legal hemp use. How did they know that? Brad Yoder told them. That's in his deposition testimony. He had a conversation with them that she had anxiety, that she took these hemp products to treatment. Right, but that's her say-so, I guess. How do we know that to be true? Know which part? That she took the hemp products? Well, that she had all these medical conditions. Was there any expert testimony, medical testimony of any kind? There was not, Your Honor. This circuit does not require expert testimony. She testified in her affidavit that she suffers from anxiety and muscle spasms. Would it always be sufficient in your view that you could offer a plausible explanation for why you failed the drug test? As soon as there's some plausible explanation, then the drug test is now no longer something that can be relied upon? I'm thinking about the example of pro baseball players, and every time they test positive for some steroid, they decide that it was in the fish that they ate or whatever it was. So they come up with some story that says the fish that were farmed must have used this steroid, and that's why it tested positive. So if they have some theoretical reason for why they failed the drug test, in your case, the oils that she was allegedly taking, is that sufficient to mean that an employer can no longer rely on the test? Well, Your Honor, I think that there is the additional fact of the doctors. No, no, but I'm not asking about this case. I understand that that may or may not be our case, but I'm trying to get it. I think what the chief's question was a little bit is like, as long as there's some theoretical story, right? In my example, right, I ate some fish and I think the fish contained the steroids that the employer can no longer rely on that test. Is that the standard that you're proposing? Because that's what you have here, right? You have a client who says, I must have tested positive, not because I'm smoking marijuana, but because I'm taking this oil, which then turns into actually, no, I'm not just taking this oil. I'm taking these other products as well. But that's that's like the fish in my example, right? So what I'm trying to get at is, is that standing alone sufficient in your view to require an employer to disregard a drug testing policy? Well, Your Honor, in summary judgment, I would say yes, because that is a fact question. The idea here is I think the heart of that question. Which is what part of that is a fact question? Do we believe that she was taking what she said she was taking, or do we believe that she was taking something else that is illegal that she should be fired for? And in your view, an employer can only enforce a a drug testing policy if it knows for certain that the positive test was because that person was using the illegal narcotic and not, in my hypothetical, eating the fish. My response to that would be not that that was that would be the only circumstance, but when there is a alternative explanation, an alternative medical explanation like we have here. Why do you say it's medical? Because she had anxiety and muscle spasms and she used... No doctor prescription. We had no doctor visit. We had no doctor confirmation. And she said to her employer she was taking CBD oil, which it does not have THC in it unless it's just a little spillover. And that's what she told them. But she tested twice. The first time the test was 50% over the allowable level. And the second time it was four times over. And then when she gives her affidavit, she doesn't say she was just taking CBD oil. She said she was taking Delta 8, THC, Delta 10, THC, THC0, and HHC. And when you look at all those, those are psychotic drugs like marijuana, which is confirmed by the tests. And you haven't challenged the tests. Well, Your Honor, the tests are all urinalysis tests. And urinalysis tests are... I'm not asking what they were. I said you haven't challenged them. Have you, below? I haven't challenged the, I guess, the accuracy of what the tests... They were done by an independent lab, right? Yes, Your Honor. The point is broader than these. Well, first off, all of those products are legal. Who says that? They violate the federal law. They were legalized under the Hemp Act. They're all derived from... That doesn't count. What they're derived from, that HHC, THC0, all of them have the marijuana. They're psychoactive drugs, and they're listed on the schedule form. They're not legal drugs.  They're exempted from Schedule 1 federally and exempted from all schedule in North Carolina by the Farm Act, the Farm Bill 2018. As the Ninth Circuit explained in the A.K. Futures case, the plain language of the Farm Bill was that the legality of these products stems from their source. It's not based on a manufacturer method. It's about are they downstream from the legalized industrial hemp product. And the Ninth Circuit case was actually one that was specific to Delta 8, saying that that was legal because it was downstream. And all of these products are downstream of industrial hemp. Can I go back to the question I asked earlier and the part of the question Judge Niemeyer asked about the medical evidence in this case? And I don't necessarily disagree with you that in some instances you might be able to get away with not requiring medical evidence. But all we have in this case, as I understand it, is your client saying that she suffers from muscle spasms and anxiety and that those muscle spasms and anxiety substantially impair her daily life activities. What's the medical evidence that supports that? Or do you think she doesn't need it at summary judgment? I think she doesn't need it at summary judgment, Your Honor. And what's your best authority for that? It is Jacobs v. North Carolina Administrative Office of the Courts. The court says at a minimum the plaintiff's testimony that working front counter caused her extreme stress and panic attacks creates a disputed issue of facts on the issue. On which issue? Because there are two questions, right? One, does she have muscle spasms? And second, are the drugs she's taking like focused on that, right? So if I come in and say I got muscle spasms, I need to take cocaine, right? So there are two different conclusions, right? It might be enough to say that she has muscle spasms, but why does it suggest to us that medically she needs to take these THC products for it? Well, Your Honor, I think that there's an issue there in comparing THC to cocaine, where it really is a legal drug, to comparing THC to something more like an over-the-counter non-prescription medicine like Sudafed, which can also cause a positive drug test. Because you can go to stores all over the state, the country, the gas station, and buy this stuff legally. It is – I suppose your question is more like are – how do – I'm sorry, Your Honor. So there are two possible things that the quote you just gave us go to, right? You said that's sufficient to establish a tribal issue of fact. There are two possible things it goes to, right? One is that they have muscle spasms, right, or headaches, or insert any symptom here, right? That's what a symptom is, is described. But then you – there's a second step, right, is that depending on which – where we are in this sort of process is like is that disabling? Is that something that can be treated by this drug? Is that something that should be treated by this drug, right? And the second part of that is what I was trying to ask you about. Okay, Your Honor, I understand. Well, I would say that, again, her testimony is that it worked for her, you know, the same way that if you had chronic sinus infection, Sudafed might work for you. Can I ask you a question about the state law claim? Sure. Help me understand. I guess I'm trying to trouble a little bit understanding your argument with respect to why a drug testing policy is not reasonably related to safety. Can you help me understand on that piece? I'm just trying to narrow it down. There are lots of issues on that, but I'm trying to narrow it down to that one particular one. As to why you think a drug testing policy is not, as it says, reasonably related to safety, even if there's some possibility that Sudafed or CBD oil or a tainted fish could cause a positive drug test, that that slight overinclusion doesn't mean that the drug testing policy is not reasonably related to safety. Can you help me understand why that is not true? Well, yes, Your Honor, I think the answer comes from what you said, slight. It's not reasonably related to those. You know, we're not talking about… Is your argument that it has to be a perfect fit, so if there's any overinclusion, so if Sudafed could cause a positive drug test, then drug testing policies as a whole have to go out the door? Because the question is, is the policy… This isn't specific to your client, right? The question is, is the policy reasonably related to safety? And so what I'm saying is, if I grant you that there's some overinclusion, Sudafed, tainted fish, maybe this oil, right, that's a slight overinclusion. But what I'm trying to figure out is, is that slight overinclusion sufficient to reject all drug policies as no longer reasonably related to safety? Yes, well, a qualified yes, Your Honor. I think that there's a distinct difference between different working environments, right? If we were talking about somebody who was driving for a living or operating heavy machinery, we'd have a much higher bar, but we're talking about somebody who worked at a desk job. Okay, so let's take that example. Do you concede that if the CBD oil was in a driving situation, that that would be reasonably related? That this policy would be reasonably related if they were driving because CBD oil is, you know, or can create psychotic issues? Yes, Your Honor. I would say even if it could, even if there was just the risk of drowsiness, if we're dealing with that kind of thing, if we're dealing with heavy machinery and vehicles, that's enough. If being drowsy would be an issue, sure. But we're talking about here, we're talking about a desk job. We're talking about, you know, there's no greater risk for taking these or any other legal medicine than anybody else of getting any sort of safety incident. Well, let's take that to an extreme. If an employee comes into the desk job high on cocaine, is that something that could be regulated on the basis of safety? I mean, the question is, what does a person say on the phone? How does a person interact with other employees? How does a person engage the equipment? I find it a little astounding that you would suggest, I don't think you did in your brief, but that drug testing is an inappropriate function of an employer. Well, Your Honor, the distinction there again is cocaine is illegal. These things are not. Look, legality doesn't have anything to do with it. But quite apart from it, it is a Schedule II and it has been determined to be a Schedule II. You seem to ignore that. That was actually the – it's in the government's brief, the actual citation to where it is shown. But quite apart from it. You want me to read to you? I'm sorry, the government's brief? The employer's brief, Diamondback's brief. Oh, okay. It's Implementation of Agricultural Improvement Act, Federal Regulation 51641. And it talks about all the THC products, even the ones that are synthetic, are all illegal under Schedule I controlled substances. But that is – legality doesn't make the difference. It's the state of mind of an employee impaired. I mean, alcohol is also legal. And if somebody comes in drunk, do you think an employer would legitimately, even in an office job, send the person home? Your Honor, I see I'm out of time. You can answer. Thank you. The issue here is that we also have this medical aspect to it, right? We have this – My question is – I'm following up on Judge Richardson's question. The question is, would an employer reasonably have a policy that would send home employees who come into the work drunk? Yes, that would be reasonable. Okay. And high on cocaine also? Yes, Your Honor. And so when they have a drug testing policy that was established before your client went to work, that is something you haven't challenged and would be a legitimate requirement of the job, right? In – Passing? In most circumstances, I suppose. All right. Thank you, Mr. Fong. Ms. Durkee? Good morning, Your Honor, and may it please the Court. In this case, we have a situation where an individual is claiming she was disabled, and therefore my client, Diamondback, allegedly discriminated against her pursuant to the ADA and a failure to accommodate claim. Those are the two that I will discuss. And the statutory North Carolina claim, my co-counsel will address shortly thereafter. The main issue here in this case, Your Honor, is whether or not the plaintiff was actually, quote-unquote, disabled pursuant to the law. An individual can be disabled if – whether the actual medical record evidence supports that, or an individual can be referred to as disabled by an employer. In this case, there is just simply no record evidence that the individual plaintiff was actually disabled under the law. She claims that she notified Diamondback in the record evidence that she had anxiety and muscle spasms. Even if – you know, Diamondback contests that, but even assuming she did provide Diamondback with that notice that she had anxiety or muscle spasms, that's still not enough under the law to arise to a disability. A disability has to substantially limit a major life activity of an individual. The email that she had sent to Diamondback – the plaintiff – let me go back a little bit. The plaintiff in this case refers to four pieces of record evidence to support the position that she was either, one, disabled under the law, or two, referred to as disabled by Diamondback. Is it your position that she needed to present medical evidence to support both her disability and the extent of the disability being sufficient to substantially affect her everyday activities? Is that your position? Your Honor, we believe that there is case law that supports – it's out of the court of Colorado. But in that case, necrosis was determined by the court that they needed medical evidence to support that it was actually a substantial – Well, what I'm asking you is do you need it in every case, and if not, why isn't her say-so here sufficient? Yes, Your Honor. So the – I don't believe you need it in every case. I think you – I believe you need it in cases where there's a mental condition, a mental health condition that's being alleged. Like anxiety? Like anxiety or a complicated brain diagnosis. I think in those situations where somebody is claiming something is ultimately related and cannot or does substantially limit a major life activity, how that occurs. It's not like a simple knee injury where, you know, if somebody's driving and their right knee is injured, you'd automatically be able to know that they would not be able to then drive an 18-wheeler truck on behalf of their entity because their knee has been affected or injured. In this case, it's a little bit different. But would it be sufficient in the knee example? Would it be enough for the driver to say, like, I hurt my knee? I was playing softball over the weekend. I hurt my knee. I'm now disabled, and I can't drive. I think what I'm trying to understand is, is that enough, right? Or do we have to have some evidence to support that, some medical evidence to support that? And maybe there's some examples where it's obvious, right? If he, instead of hurting his knee, lost his leg, we might not need the medical evidence that his leg is gone. We could see that. But for things that we can't see, do we require some sort of medical evidence or not? I'm actually not sure about that. Yeah, I think if you had a sprain of a knee and that you're claiming is now causing you to substantially limit a major life activity, I think in that situation, you would need a medical note or evidence to support that, that you no longer can do that aspect or function of your job in order to, because of that condition. But again, there are two pieces to that, right? One is, I was trying to ask your colleague about this. One is, do you have the condition? Do you have a sprain? And two is, how is it affecting you, right? Or how is it being treated? And there are two pieces of that. Do we need medical evidence for both of them or just one? Do you see what I'm saying? So in other words, my knee hurts. I sprained it, right? That's the symptom, right? But also, I can't drive as a result is a separate piece of the equation. Are those different? I believe that they are. And I think in the sense of because of this claim or this knee injury, I cannot do this. I think that's a situation where you would need a medical note versus actually being diagnosed with anxiety or muscle spasms. I think in that sense, whether you're diagnosed or not, whether you're just simply claiming I have a knee pain or a knee sprain, in that situation, I don't think you need a medical note. But if you're going to go a step further, if you're going to take that next step and say, because of this injury, I cannot do X, then I think in that situation, you would need some sort of medical support in order to explain or properly provide your employer with notice as to how it is substantially limiting a major life activity like your employment or ability to do a function of your job. I believe in this case, what the plaintiff is failing to realize is that in this case, even assuming she had anxiety and, quote, unquote, muscle spasms, nothing within the record suggests she ever told her employer she had one actually been diagnosed with that. There's a RN nurse note that was referred to by the plaintiff. It's unsubstantiated. It's unsworn. But assuming it even can come into court at the trial stage, we still think that this would show that, okay, she had anxiety and muscle spasms. Why do you say that? That note said nothing. That note said this is to confirm that she's taking CBD oil. That's it. That's it, right? So it actually did say that if she confirmed, the medical note does state that she could confirm the individual was taking CBD products for anxiety and muscle spasms. Yeah. But she did not state. She just said confirm that she was taking that. Correct. She didn't diagnose it. Correct. She didn't prescribe it? She just confirmed it. Well, we know she was taking it because she said she was taking it. Yes, Your Honor. And as for the plaintiff's deposition testimony, during her deposition testimony, she testified that she told, again, her nurse that she was taking CBD for anxiety and muscle spasms. But, again, she didn't testify that somebody had diagnosed her with those treatments. And the medical records that were actually produced in the underlying record in the case actually suggest that she was not ever diagnosed with anxiety or never diagnosed with muscle spasms or complained of muscle spasms, but never actually diagnosed with anxiety until nearly eight months after she had left her employment with Diamondback. The e-mail, Your Honor, that's referenced by the plaintiff, it's an e-mail that was sent to the owners of Diamondback and her then supervisor at Diamondback. And the e-mail, I think, is very telling. It states that she uses CBD generally for everything else. She doesn't actually state within her e-mail that she had anxiety or muscle spasms, allegedly placing her employer at that time on notice. She also generally states that in her prior employment had a service dog in the office with her. But, again, that's prior to her employment with Diamondback. There's nothing in that e-mail that states that during her employment with Diamondback, she was, one, still suffering from anxiety or muscle spasms, suffering from any medical condition at all, and that at that time presently she was dealing with a medical condition that would substantially limit a major life activity. As for, I actually wanted to go back, and one of the examples that my co-counsel was actually asked was whether or not everything has to have a plausible explanation with the fish example when doing the drug test. And I think in your example, you know, assuming there is a plausible explanation because I consumed fish, providing that second chance to take the drug test, in this case she had three chances to take a drug test that was provided by her employer. That's in the record. And, in fact, the final time that she took it, she was three times higher than her initial testing for employment. It looks like it was four times, 198 nanograms, which is around 200, and 50 is the baseline. Correct, Your Honor, and I apologize for that, yes. But let me ask you something. I have understood that the CBD is not psychoactive, but I understand that Delta-8, THC, and HHC are all psychoactive, and she constantly talked about taking CBD oil, which is not psychoactive, yet she was tested and found to have these fairly large blood content of psychoactive drugs in her blood. And it seems to me that while she's telling everybody at work she takes CBD oil in her affidavit, she admitted taking all these psychoactive drugs. Yes, Your Honor. And, of course, that showed up in the drug test, which I don't think, have they been challenged? They have not, Your Honor. The drug tests have not been challenged. I believe there was a reference within my opposing party's brief that referenced a hair testing sample and how in that it was unreliable to test for CBD versus THC levels, but in this case that's not what occurred. This was a urine sample, not a hair analysis, and there's not been any contention that it was done improperly or that the results of it were inaccurate in any way, shape, or form. The allegation is that the use of not only CBD oil, which is what was relayed to Diamondback at the time, but that use of products like THC and HCCO was legal and, therefore, not different from the use of CBD oil. The actual statute from North Carolina, the federal statute, actually determines that if it's synthetically derived, if it's a product that's not derived from the product itself, but synthetically derived in a laboratory, then it is considered a substance one, a control one substance, and it is, therefore, an illegal use of the… I don't understand why there's this argument about whether it's legal or not. I mean, alcohol's legal, and yet it can cause somebody to be terminated, right? Yes, Your Honor. If the company had a policy? Yes, Your Honor. And here the company has a policy that says, we're going to drug test you, and she failed the drug test twice, and the first time, clearly, and the second time by four times. So, she has THC in her blood, which is a psychoactive drug, and the only reason given for her termination was she failed the drug test. Yes, Your Honor. Isn't that right? Yes, correct. There was no other reasoning behind the termination. In fact, Mr. Yoder, who was her supervisor at the time, actually testified various times throughout his deposition that the sole reason of her termination was the positive drug results. There was no other indication or reasoning behind why she was ultimately terminated. It was simply because the drug test came back positive and in the amounts that it came back positive. And with that, Your Honor, I'd like to reserve the rest of my time for my co-counsel. Thank you, Ms. Thurkey. Mr. Marcus. Good morning, Your Honors, and may it please the Court. Jeffrey Marcus for Diamondback. I'm going to address the North Carolina General Statute claim. This is section 95-28.2b, where it talks about it's unlawful to discriminate against an employee who lawfully uses a lawful product during nonworking hours, and it's off the premise of the employer. So to first start, and my co-counsel touched upon this, Ms. Anderson was not using a lawful product. As admitted in written discovery in her brief, she was using THCO, and that is completely synthetic. And as the AIA and North Carolina General Statute section 90-89, subsection 7, talks about synthetic drugs, synthetic tetra cannabinols still being a controlled substance. They're section 1 controlled substances. And so because THCO is a synthetic THC… Wait, but help me understand that. I want to be sure we talk about the exception, too. Absolutely. But so I understood THCO as taking a natural substance, right, that's the delta-8, and adding a synthetic substance to it. But to me, we're still starting with a natural substance, right? And so it would seem like it's not synthetic because it's still derived from the natural, right? The fact that they added something synthetic to it, food coloring, whatever it might be, doesn't change that it's derived from. I'm not sure why that makes sense, but I'm just trying to read the statute, right? It still seems like it's derived from the natural product. Absolutely, Your Honor, and there's no expert testimony about the derivatives and how THCO is derived. But I'll point you to North Carolina General Statute section 90-89, where it specifically talks about any quantity of any synthetic chemical compound that is a cannabinoid receptor agonist and mimics the pharmacological effects of naturally occurring substances. But that just goes back to what's synthetic, right? So all that question is, what's synthetic? So is something synthetic because its base is synthetic? Or is something synthetic if you take a natural base and you add something to it, right? This acetic anhydride, right? So is the addition of something synthetic to a natural product, does that create a synthetic? It seems like if you're starting with a natural product, it doesn't, but why am I missing that? Your Honor, my understanding is that once you add a synthetic compound to the natural substance itself, it creates something that's completely different. Any synthetic product, right? So if I put food coloring on it, hemp with food coloring is now a synthetic cannabinoid, not hemp, because it's got a synthetic… Well, Your Honor, I think it would go a step further. It wouldn't be the food coloring itself, it would be an actual derivative, an actual synthetic derivative of cannabis itself and adding that. So if you have Delta-8-THC-O, you're adding an acetate ester, which is a, from my understanding, a synthetic portion to the natural occurring, that makes it synthetic itself. It's a synthetic additive of the cannabis itself. Okay. We don't really have expert testimony on those questions. Absolutely, Your Honor. The district courts seem to rely on this bona fide exception instead of trying to figure out what the story is with these various compounds. I asked your colleague about this. Can you talk to me about the second piece of the bona fide exception? One is it's got to be bona fide. That seems pretty easy here. But the reasonably related to safety… Safety and efficiency, Your Honor. Safety and efficiency, right? Can you talk to me about why some over-inclusion… So just posit hypothetically that one might think that it's overly inclusive because it might be a false test for CBD oil or THC that's hypothetically at least illegal or pseudofed or, in my example, a bad fish. Why that over-inclusiveness matters or doesn't matter? Well, Your Honor, I think it matters to an extent because an employer… because it wants to make sure its employees are not, you know, associate attorneys are not coming in with the possibility of being impaired and, therefore, writing something incorrect in a contract, which could end up causing massive liability down the line, mergers, acquisitions. You write something, a provision that's incorrect in a contract, and then all of a sudden, whether the contract could be void, whether it could have a mistake in it, it could be substantial. And this is a land acquisition company, Diamondback Investment Group, and Ms. Anderson was a contract liaison. She was dealing with contracts itself. So for Diamondback to have a drug-testing policy to prevent the possibility of its employees, such as Ms. Anderson, coming in impaired and possibly having an issue, regardless of whether she did or not, but the possibility is what employers want to avoid. So two pieces I take from your answer. There are two pieces of that. One is we're not looking at individual… when we're asking whether the policy is reasonably related to safety and efficiency, we're looking at the policy as a whole, not maybe as applied to a particular person. Is that fair? Your Honor. And then the second piece of that is to be reasonably related, if the over-inclusion was too large, it might not be reasonably related. But so long as the over-inclusion was not so substantial, your point is, I take it, is that that over-inclusion doesn't make it unreasonably related. Right. Your Honor, and the district court pointed to Miller, the Institute of Defense Analysts, and talking about an employer imposing a policy in good faith, honesty, and sincerity. There's nothing to suggest opposite here for Diamondback's policy. They talk about, you know, the drug testing policy itself. Ms. Anderson was tested for five specific drugs, and highly controlled and regulated drugs. Opiates, marijuana, cocaine, PCP. So these are highly regulated drugs. If it was, let me test you for Tylenol. That might go to your over-inclusion part, where if you tested positive for Tylenol, I mean, you could take it for a headache. But this is narrowly limited to heavily regulated substances. Can I ask you whether you know the threshold here is 50 nanograms if the employee has more than 50? Is the 50 level, does that include, is that sufficient level to exclude minor spillovers or false showings? From my understanding, the 50 is the pause and walk. I'm not entirely sure whether that exact 50 could include false pauses itself, but here, Ms. Anderson tested. Well, I know she tested much above that, but I was just finding out the policy defines, or the lab defined, 50 nanograms as the level. And they were testing on their report for marijuana. That's correct. That's correct, Your Honor. And for the reasons provided in Diamondback's brief and the arguments of counsel, we ask that this court affirm the district court's judgment in its entirety. Thank you, Your Honor. Thank you, Mr. Marcus. Mr. Fong? Can I, can you start with the last point that your colleague asked about? Why is it that, what argument or evidence did you put on that the drug policy, the policy as a whole, is not reasonably related to safety and efficiency? So, I mean, understanding you think your as-applied example might be, but accept that there can be some over-inclusion, right? It ended up to be a perfect fit. Why is the policy itself, and I'm just talking about the North Carolina statute piece, right? And I'm only talking about the bona fide exception to the North Carolina statute piece, but posit that that seems like the hardest part. Why that's not reasonably related to safety and efficiency? Right, Your Honor. So, you're talking about the policy as a whole versus the policy as applied here. But if we look at the wording of the statute, the statute's concerned with the policy as applied here. Because what the statute says is restrict the lawful use of lawful products by employees during non-working hours if the restriction relates to a bona fide occupational requirement and is reasonably related to the employment activities. Yeah, but that's by policy, not to individual persons, right? So, your response to this is, no, it's not policy. They have to show for each individual employee, based on the supposed excuse they have for failing the drug test, that for that person, that it was really important. And so at each level, not to the policy for this class of workers, right? All drivers need to do this. They would have to show that for this driver, they could not be under the influence. It's person-specific. That's your response to that argument? Yes, Your Honor. And that's just the language of the statute. If you look at Section B there, it says unlawful employment, it's an unlawful employment practice for the employer to fail to refuse to hire a prospective employee or discharge or otherwise discriminate against any employee with respect to compensation terms, conditions, privileges of employment because of lawful use of lawful products. The statute's concerned with employees, not policy. I agree that the first part is, but the bona fide exception piece doesn't, right? Because it refers to groups of employees, right? So this is the subsection C. I'm talking about the exception, right? So whether it's a bona fide and reasonably related is not part of the prohibition, it's part of the exception, right? And it talks about what are bona fide occupational requirements, and it refers either to an employee or groups of employees, right? So the policy can be permissible, not requiring each individual. You don't have to show that the occupational requirement is for each individual, it's to the group. Well, again, Your Honor, I would posit that this is a statute concerned with the individual rights. So your response to the argument is we've got to look at your client. We can't look at whether the policy was reasonably related to safety and efficiency of these employees. And you've not made an argument that the policy itself doesn't. Yours is limited to Ms. Anderson. Your argument is limited to Ms. Anderson. Yes, Your Honor. As you keep saying, over-inclusion, why is over-inclusion not okay? Over-inclusion is not okay here because this is a statute that is meant to protect individual rights, and it is worded as such. Can I ask one more question? Sorry. In the alcohol example, if I was a driver and I said, you know, listen, I can drink a lot of beer. I mean, it doesn't affect me like it does most people. And so I ought to be able to drink a six-pack before I drive around. And here, like, I want to get tested, right? And so I will go do the road tests. And as long as I can walk on the straight line and touch my nose and recite the alphabet backwards and the various tests, that I should be able to drink and drive under your company policy because I'm not affected the way other people are. Would that be a valid? So in that instance, you would say that would not be a bona fide reason to fire me since I'm not affected the way everybody else is? It's specific to that employee. Is that right? Ms. Anderson's not affected by THC like other people are, so she gets to work there while she's high. I would say, Your Honor, that I want to go back to there is a difference between an office job and a job where you're operating heavy machinery. So I would say in the circumstance where we're talking about an office job, where the risk. How do you explain that answer in light of the criterion of efficiency? It seems to me efficiency is a criterion that would be applicable in an office job, in the factory or in other types of jobs. Right. So the difference here, I see I'm way past my time. Can I answer? Yes. So the difference here is, you know, if we're talking about what's the worst that could happen, if we're talking about heavy machinery, we're talking about driving, that's way bad. I'm just trying to get to the statutory language of efficiency, which you are addressing safety, trying to make a distinction between the safety issue is not as aggravated or is not as serious in this context when you work in an office, as opposed to somebody who drives a truck or works in a factory or something else. But I was trying to focus on the word efficiency to the statutory word efficiency. And it seems to me that that would apply across the board. Well, your honor, the word safety or efficiency, neither of those is in the statute. Safety is the argument that the defense made efficiency. Actually, you guys, I think, are the first ones to mention that. But to answer your question, actually, is when we're talking about when we're talking about this situation, I would say the the line would be let the the employment or let the failure at your job, the failure and efficiency performance be the thing, be the legitimate non-discriminatory reason that you discipline or terminate the employee, not the over-inclusive blanket policy. So to follow up on Judge Richardson's point, I guess the question is the plaintiff would still have to show some medical reason for requiring for drinking a six pack of beer, right? It's just you drink a six pack of beer just because you like to drink. That doesn't show any evidence of a disability. But assuming they can show that, your position is that an office worker would be allowed to drink a six pack of beer during lunch, come back to work, and the employer couldn't do anything about that. Well, your honor, I think here you're confusing the two statutes a little bit. So the general, the NCGIN stat, the lawful use of lawful products statute doesn't have anything.  It's just lawful use of lawful products. It's what's okay. So yeah, thank you for that. So back to my hypothetical, that's okay? Yes, your honor. As long as their performance does not affect their performance or presentation, nothing that you could write up any other employee about. As long as that's not affected, then yeah, that's a lawful use of a lawful product outside of working hours. I'm going to go get a six pack after lunch here today. It used to be more common, a martini lunch. If I could have just one more question, Chief, I'm sorry. I just want to make sure I understand your position on efficiency. So the company's brief talks about efficiency, including on page 32. I just searched for the word because I thought I remembered it. You said we brought it up. You didn't respond to it, given at least that it's in the brief. Have you argued that it's not otherwise raised or that we shouldn't consider it for some other reason? I mean, it's in their brief. No, I think that's… Assuming it's in their brief. I'm not asking you to take… I mean, it is, but you don't have to take my word for it. But assuming it's in their brief, you're not making a separate argument for why we shouldn't consider efficiency as part of whether that policy is reasonably related? No, your honor. My point is just evaluate the employee based on their actual performance. All right. Thank you, Mr. Fong. Thank you both for all three for your arguments this morning. We'll come down and greet counsel and move on to our second case.
judges: Albert Diaz, Paul V. Niemeyer, Julius N. Richardson